I'm going to ask you before I try to go ahead and pronounce your name for us. I knew that question was coming. Navar. Jared Navar. Navar? All right. Thank you, Mr. Navar. Thank you, Your Honors, and may it please the Court. There are four provisions at issue in this appeal, and I'll start with the base limit. And base limit cases can seem complex with talk about numbers and election results and campaign spending, statistics. This one doesn't require any of that. It's actually very simple, because Austin's base limit is uniquely severe and uniquely poorly suited or tailored to the threat of corruption. And Zimmerman raised two fundamental arguments. The first one is underinclusiveness. That is that the $350 base limit is an unnecessary abridgment of First Amendment rights to make campaign contributions, given the fact that the same contributor at the same time can give an unlimited amount to an incumbent officeholder for officeholder expenses or for a legal fund or to retire debt, which the former officeholder can then use to, you know, they retire their debts and they run again. Those officeholders, there are legal restrictions, aren't there, on what they can do with the officeholder account? That's true, Your Honor. But one thing that's permitted that I've highlighted in the briefing is, for example, newsletters. They can send newsletters to their constituents highlighting their activities. They can include photographs of themselves, you know, here's what I've been doing for you. And that's permissible under state law, Texas Administrative Code, which I've cited in the brief, and specifically under the Austin Code provision governing officeholder accounts. And this is important for a later part of the argument, but that category of officeholder expenditures also, so it includes things like newsletters, which implicate First Amendment interests, but it also includes things that have nothing to do, that are not protected under the First Amendment, like payments for staff or travel or, you know, various categories of things. Sometimes they buy additional computers or things like that or additional office furniture or artwork for the office or anything like that, right? Exactly. So that would also be unlimited. The same contributor can give an unlimited amount to pay for staff expenses, who's limited to $350 for campaign contributions to the same incumbent candidate. But this goes to which of the two prongs to assess the base limit? Because if Austin only had justification as to the base limits, they may not be able to reach what you're calling the under-exclusivity point. Well, so the under-inclusiveness argument, it's – this is common in First Amendment cases, but it's not always raised by plaintiffs, and it's sort of – you have to sort of get into the details here. But the reason it renders this base limit under-inclusive is because you can't – because when you have an exception that blows a huge hole in the anti-corruption interest of the government, which is the only way they can justify any limit on campaign contributions, when you're allowed to give unlimited amounts for things that don't even implicate the First Amendment, but the general public is still limited and that same contributor can only give $350 for a campaign contribution, both of those contributions present the threat of corruption that Buckley identified. Maybe Austin just wants to tackle one after the other, and they had the testimony from Butts and Lewis to justify the one they did, but they didn't have sufficient justification to do even more aggressive equalization of all aspects. Well, that's a theme that sometimes defeats these under-inclusiveness arguments, and I was going to raise this later, but – and the city raised the Wagner v. FEC case, which is the – the D.C. Circuit upheld the ban on federal contractor contributions. But if you read that under-inclusiveness analysis, it only highlights why this limit is – cannot stand that scrutiny. And mind you, that was a case involving intermediate scrutiny of a contribution limit, and they still analyze it for under-inclusiveness, but there's a long section in there. Number one, that ban targeted federal contractor contributions, which the court explained several reasons why there – there was special danger there. That was not the same danger as with federal employees even. What's your best circuit decision overturning a base limit based on an under-exclusivity argument? Well, there are none because there – and this is my specialization, campaign finance. I've never run across any base limit case involving an exception for officeholder contributions. It's not just an issue of first impression for this court. It's never been raised in any court that I've ever seen. And so – and Buckley, I was going to highlight, if you go to page 26 of Buckley, when – when Buckley sets out the government interest that still governs all this case law, they said the threat of corruption is presented from large financial transfers given to current and potential officeholders. So it's not – it can't be cabined to just campaign contributions. The same person, incumbent candidate, running for office, to say that a contributor can give $100,000 for their staff, but can still be limited because of the threat of corruption and what they can give for campaign speech, it elevates speech that's not even – I mean, activity, staff expenses, that's not even protected by the First Amendment above – and that's potentially more corrupting because officeholder contributions apply only to a category of people who are already in office. In other words, campaign contributions – But once you say potentially, then reaching that extra level would have a difficulty under current law, right? Austin would have to be able to show that there actually is quid pro quo corruption in the context you're trying to say we should worry more about. Well, no. What I'm saying is that based on page 26 in Buckley, this just comes straight from Buckley. Buckley said the threat of quid pro quo comes from large financial transfers given to current and potential officeholders. And so it's a common-sense thing, and the cities – I highlighted in the brief – I don't have the record references in my mind at the moment, but in the brief I highlighted where their witnesses, including the expert they designated, admitted that if this is true, if you can give an unlimited contribution to an officeholder, that it presents the same threat of corruption. And there was another witness who admitted that as well from their side. Under state law, just remind me, so if an individual gives – you gave the example of $100,000 to an officeholder account, is that publicly reported in the same manner that a campaign contribution would be reported? It is, Your Honor. It would show up on the report. These definitions come from state law, and so there's a schedule – the schedule on the campaign report is called political contributions, and that includes campaign and officeholder contributions. All right, but I mean, in terms of the corruption, at least the public disclosure would help to – at least sheds the light of day on the transfer of money. Well, it does, and of course the same is true of campaign contributions. They're reported as well. So you get back to the question of any time the government has these exceptions in a law like this, under the First Amendment particularly, but not even limited to the First Amendment, and I'll get to that in a moment, but the government has to offer some justification for why it's okay to limit this and not that. And there's – you'll search the record in vain for any attempted explanation. The city has raised these standing arguments and saying – trying to get away from the merits of this argument, and they have never offered any justification for these kind of questions you're asking. Why does it not present the same threat? And back to Judge – The position narrowly to us is 8A1 would be constitutional if it were equally applied. Well, no, because the second argument is that it's – given the framework that exists in Austin, it's different in kind than what happened in Buckley, what was apparent under federal law in Buckley. And so the second argument is that it's still too low and too restrictive in light of the whole framework that's at issue. But this is just an additional reason why, even if it were otherwise constitutional, you cannot have a strict limit for the entire general public on fundamental campaign contributions protected in the First Amendment while somebody trying to corrupt an officeholder, somebody with business before the city council coming up on an agenda, can pay $100,000 at the same time to pay for staff expenses or a newsletter. If somebody wants to corrupt the officeholder, the avenue is obvious. And so the city's only argument has been to dispute the plain text of the charter, and I'll reply to that in my reply time. And so I think it's clear under Buckley that those officeholder contributions present the same threat of corruption. And I was going to highlight, so back to — The threat of corruption to reach the officeholders, you're saying, is just based on Buckley's formula, and that's true even after McCrutchen? It's true under McCrutchen. I mean, if candidates, most of whom are not even incumbents, at the time they're taking contributions, if challenging candidates can present a threat of corruption as potential officeholders, then contributions to current officeholders wielding government authority, just as a matter of common sense, but it derives from that language in Buckley as well, present the same threat of corruption. And again, their witnesses admitted that. And I highlighted some cases applying this analysis, including the Green v. Farrell case, a prisoner's speech case from this circuit, holding that a prison couldn't justify a ban on newspapers when there was an exception for magazines. I also highlighted some cases. There was a Van Natta case from the Ninth Circuit, a campaign finance case. You go to the commercial speech context where this analysis is applied to strike down laws, even under the central Hudson test. And then the concurrence in Reed by Justice Kagan also points this issue out, where she was saying, look, you don't have to go to strict scrutiny because we can strike this down for under-inclusiveness even under lesser scrutiny. And so if this base limit can stand with these exceptions, you're effectively elevating prisoner speech and commercial speech above the fundamental rights of political association that are presented here. And I do believe strict scrutiny must apply. It's content based on its face under Reed. I want to point out on that point, you don't have to reach that, frankly, because you can, as I just argued, but if you do, this argument that it's going to upend campaign finance jurisprudence across the country is a red herring because it doesn't mean that a dollar level in a base limit would be subject to strict scrutiny. The argument is when there's a content based distinction, which is presented by officeholder newsletters versus other types of speech, that's a content based distinction, that distinction, that exception incurs strict scrutiny, not the level of $350. So it's not to particular speakers, triggers content, it's all speakers in office regardless of the positions and ideas they're endorsing? That's still a content based restriction? That's correct. And this is a function of the definitions in state law, but officeholder versus campaign contributions, the distinction turns on the purpose of the association. If I'm giving you money with the intent that you use it for an officeholder newsletter or staff, that's an officeholder contribution. If I'm giving you money with the intent. Okay. So I've got three and a half minutes left and I will, and I'll reply to their points on the, so essentially just to finish the base limit issue off, well, so the other main argument is clearly in the brief, and Nixon, the city relies on Nixon versus shrink, and Nixon highlighted this issue. Nixon's state interest analysis was abrogated, but Nixon highlighted this issue about why the base limit in Austin is so fundamentally different. Nixon said that we're not faced with a contribution limit in Missouri that's different in kind from that in Buckley, because as Buckley showed, you have all these other alternative avenues of association, independent speech, PAC contributions, party support, things like that, volunteer exception. Those alternate avenues are the only way that Buckley reached the conclusion to say that the base limit in Buckley, which, by the way, was worth $6,000 in 2015 dollars, is not a significant impairment of First Amendment rights in light of all these other alternative avenues of association. I've argued all those are foreclosed in Austin, and I can address that in more detail in reply, but I want to touch at least briefly on the aggregate limit. That's the other part of Zimmerman's appeal. The standing here is clear that the district court didn't even address the standing arguments that we had. In other words, the district court just said, well, you're not close to meeting this aggregate $36,000 limit, and so no threat of prosecution for that and no standing. All that's required is an identifiable trifle. As long as it's not speculative and it's actual or imminent, chilled speech gives you Article III standing. That's clear under Scrapp and Cramer and Acorn cases that I cited. Zimmerman withheld his solicitations that he wanted to send to fundraise throughout the state of Texas. He changed his campaign plans, and he suffered these compliance burdens that would be required to determine voter registration status. So all of those independently, any one of those independently, is sufficient for Article III standing. So I asked the court to reverse that, find Zimmerman has standing, and remand on that score for a merits determination. And I want to point out, even if you accept the city's argument about, you know, they try to claim that you don't have to verify voter registration, that's not true, but it remains true that Zimmerman still forewent plans that he wanted to engage in for fundraising merely because this limit is on the books. And that's sufficient, as I've argued in the brief and cited authorities, for standing. As to the blackout period, the main point I'll make now, I think I explained this well in the brief about how it just simply doesn't address corruption. McCutcheon basically makes a fundamental point about if you can give up to the base limit at certain time periods, it doesn't make any sense in terms of the anti-corruption threat to limit contributions to something less than that or, you know, something else occurred and now you can't give up to the base limit. And my time is up, and I'll reserve the rest for reply. Thank you, Mr. Naval. Yes, you saved time for rebuttal. Mr. Hicks? May it please the Court, Brene Hicks. How many Fifth Circuit arguments for you, Mr. Hicks, in many years? Too many, my wife would say. And this may be one too many, it may turn out. Your Honors, I first want to address the principal argument that was addressed in the opening. And it's premised on something that's just completely made out of whole cloth. There is no unlimited contribution allowance for officeholders under the city of Austin's charter. Where this idea that there is, which is the premise of their principal argument, where it came from, I cannot say. It seems to me that it cuts the other way. In other words, if it's unlimited, then if it tends to favor a corruption, which is neither here nor there for purposes of the question, then it's even worse. I mean, if there were a $1,000 limit to officeholder accounts, that would be one thing, but unlimited is something else. It is, and that would be a problem for them, too. But what my point is, Section 8G of the charter provision says mayor and city council members are subject to the same kinds of rules that candidates are, which means they're subject to a $350 limit or 300 index for inflation, which is 350 right now. They're limited to the same contribution. So I couldn't give to our council member Zimmerman, where he's still on the council, $380 for his officeholder account. I couldn't do it under the provision. So there is no differential treatment of them. They're treated the same. Even if they're an incumbent not running for re-election? Yes, in terms of office. Any officeholder account. Any officeholder account. 8G couldn't be. I don't think it could be. It could be perhaps a little clearer, but it seems pretty darn clear to me that that's so. And this idea that there's differential treatment came from nothing. Mr. Zimmerman testified at trial that he kind of thinks that it may be this way. Mr. Zimmerman, that is, that there may be an unlimited level of contributions you can make to an officeholder but not to a candidate, that it's capped. But that came from nothing. No, there's no testimony that it's ever happened. There's no testimony that the city of Austin treats it that way, that any council member's ever done that. Mr. Zimmerman is a software engineer, not a lawyer. I don't know where this came from, but it's just not there. If it were there, would you lose? I don't think so, for the reasons Judge Smith said. I don't think it's — that is, if it were there, it wouldn't be — still wouldn't be a — it wouldn't be subject to strict scrutiny because it's not a content-based distinction under Reed v. Towne and Gilbert, and the differential treatment may have differential reasons for it. You'd have to justify each statement. We would be obligated to justify it if we did it. He isn't — the challenge is not to a limit on contributions to officeholders. That's not the challenge. So we don't have to defend the limit right here. And he's no longer an officeholder, so we never will with respect to him. But we aren't here to defend that. We're only here — and their only challenge was to the campaign contribution limit for candidates. Nothing to officeholders. And so, anyway, that's just — I don't know why they're focusing on that, but it's factually baseless to set it up as a premise, and it's legally useless to them, it seems, ultimately. But there is, at least the argument is, and it seems to me it's not a frivolous argument, that there's an advantage if you run and win because you can use your officeholder account for many things that would include, his example, a newsletter. Well, yes, there's that advantage, but I don't know that that advantage means anything under the legal structure that's in place for these matters. Secondly, this is all of a piece. So there's also a disadvantage if you run and win because if you lose, you can go off and raise money to pay your campaign — payoff accounts or whatever, expenses. So there are advantages and disadvantages, nothing major, but advantages and disadvantages a little here and a little there on either side of the equation of incumbent versus non-incumbent versus challenger. So I don't think that that — that comes out in the wash, I guess I would say, when you ultimately analyze this. I suppose there's a question about the quid pro quo nature of a contribution to an officeholder account where you have to publicly report those amounts. The whole premise of the quid pro quo being the basis for not allowing above a certain limit, I suppose there's a different distinction between someone running for office as opposed to someone who's in office and getting that money for, as Judge Smith said, a new fax machine or something. Right. Or community meeting in your district or whatever and coffee for that. I mean, it arguably gives an advantage, but — I apologize, Your Honor. I'm just not following. Since it's not — their only argument about it is the disequilibrium that's created. Factually, that's a baseless argument, but legally speaking, I guess it's what you're trying to get at here. Assume there is that difference. Then there is some — I mean, there are benefits from being in the office anyway. You have a bully pulpit. Mr. Zimmerman is a prime example that used it for issues not related to the city. So you have all sorts of advantages, but you can't squeeze that out of the system, I don't think. Officeholders have to be able to, you know, go meet with their constituents. It's helpful. Instead of the city appropriating money, if they have an officeholder account, they can buy coffee and donuts for people when they come in on a Monday night to meet on some issue. So I don't see that — I just don't see that as an issue in this case. Well, but Mr. Zimmerman's argument, it seems to me, is that if we look at the sort of the totality of the circumstances, the effect of having a limit on the campaign contribution is to exaggerate the advantage that incumbents have. Because when they run for re-election, they have the advantage not only of being able to accept the 350, but of having the advantage of an officeholder account, newsletters, whatever, town hall meetings, whatever it is. Yes. That is exacerbated by the $350 limit of what, 380, whatever it is. 350. There's some slight advantage, but there's always advantages to incumbency, although there wasn't for Mr. Zimmerman this time. But there are always some advantages. But I come back to the premise. The premise is wrong. There's not a differential anyway. It's just flat wrong. There's nothing in the record to support it other than Mr. Zimmerman's speculation that that might be so. Nothing. No evidence that's ever been treated that way by anybody. I want to turn to the six-month window issue, the temporal restriction issue, briefly, because that's one of our cross-appeals. Mr. Crossfield, would you have just a case you'd cite for us on standing, on his lack of standing for the aggregate limit? Clapper, I guess, would be the most obvious one. It's sheer speculation that he would ever have. He didn't even come close to facing it. It was merely a theoretical concern he had. His argument that I made a cost-benefit determination that if I could only raise $36,000 that way, I wouldn't spend any money, if you do the calculation based on the evidence, he would have gotten about a 550% return if he could have hit even the limit, not go beyond it, in terms of his expenditure versus what he would have gotten back. That isn't the consequence of the limit. That's a consequence of him deciding how to marshal his resources for how he wants to run. So I don't think that that's a standing issue with respect to receiving contributions. That's just how he wants to spend his money. And the fact that on the inside the envelope, non-person contributors that are part of the aggregation, the fact that it might be difficult to figure them out. All the testimony was might or could or probably not. It's all might, could. The testimony from Mr. Butts, who's been around forever in city of Austin politics, said it's not hard. Go ahead with the blackout argument. Okay. Let me just briefly say, though, even that is a decision with respect that is the entire time, determining what to do. Everybody has to do things in campaign finance law these days. You have to keep track of all sorts of things. If this were a problem to give standing, you would have standing if you just fill out a form in campaign finance. So I don't think, I think Clapper says they don't have standing there. And it's not going to be repeated because he isn't an officeholder anymore and he isn't a candidate right now. On the blackout period, I first want to apologize to the Court. In the last paragraph on page 6 of my reply brief, I misstate. It was inadvertent. But I don't write it. I read it last night. I didn't write it very well. I basically suggest in the way I wrote it that Buckley v. Vallejo addressed a temporal restriction. It didn't. And then I cite Talheimer, the Ninth Circuit case. I didn't say it right. What I meant to say was the standard set out in Buckley v. Vallejo fits the analysis in Talheimer, so I apologize for that. And I just noticed it. I didn't want it to go by without commenting on it. On the six-month open window matter, Talheimer is the main case that we have that supported that. It was a one-year restriction, admittedly. This is a six-month restriction. But the test is the same for how you evaluate the temporal ban. Okay? It is a ban up until six months before the election. And FEC v. Beaumont, this is cited, which is a 2008 Supreme Court decision, which I don't cite, but I do cite the Wagner case, which is an en banc decision out of the D.C. Circuit, which cites FEC v. Beaumont. It says bans and limits on contributions are analyzed under the same Buckley v. Vallejo analysis. You have to have this substantial, meaningful governmental interest, and then you have to closely draw the restriction based on that. So the ban is the same under the same analysis as the contribution limit. The pre-six-month ban is analyzed under the same rubric. Talheimer was before McCutcheon. It was. McCutcheon did not address this issue. McCutcheon is an aggregate limit on how much any one individual can give to different people. So it didn't have a temporal ban in it. McCutcheon has no majority. It's the same test. It speaks to the necessity to particularize the justification according to whatever regulatory regime you're setting up. And so what I thought the problem here was there wasn't testimony equivalent to Butts and Lewis speaking to corruption that had occurred in this outer limit time. There was. So you're saying there was facts. There was testimony, yes. Beyond just money pours in when we're about to vote? The problem is that that creates the perception of quid pro quo corruption. Yes. Can a witness say that led to a perception of quid pro quo corruption or anything like that? I can't remember. Yes. I mean, I can't remember. She said it caused great concern to have money coming in when you're voting on issues as you get closer. It doesn't concern everyone, but that's influence that wouldn't be a suggestion. I think she said, I think this is Councilmember Morrison, former Councilmember Morrison, two-term Councilmember. I believe she testified about it. And Judge Mr. Lewis also, as I recall, testified about this problem, too, in terms of the appearance of quid pro quo corruption. And Judge Yackel credited his testimony. He found that we had established, met the first part of the test. No, as to the six months. We don't have proof that somebody got a payoff within that period. But you don't have to. Say it again. I disagree, Your Honor, with that. I believe — and Judge Yackel, I believe his findings disagree with that, too. He says that we have — we met — he testifies to Mr. Lewis's testimony and says, essentially, we met the governmental interest part of the test. Judge Yackel then turned, which is the appearance of corruption issue. And — The logic of your argument is if justification for a base limit, always justification for a temporal limit? No, no. No, not at all. We — I'm just saying we separately addressed the temporal limit issue, too, in the testimony. It wasn't, hey, people are concerned about corruption, so anything we do is okay. It wasn't that. It was, here are the limits, we said, on individual contributions. Then Mr. Lewis and Councilmember Morrison testified about the problems with contributions  but about how reasonable that limit is, because most contributions come in within the six-month period, except for those that have a specialized interest a lot of times. It didn't — nothing in this is uniform. And we don't have a bribery claim or proof of bribery happening here. We talk about the perception of the problem. And as I said, Judge Yackel accepted that testimony and found, inciting Mr. Lewis, that we had met that part of the test. And it was as to the temporal limit. It wasn't just a broad-based, we're concerned so we can do a temporal limit, we can do a contribution limit, and so on. Judge Yackel instead said he questioned the amount of time that we set, whether it was a year. He implied, although he didn't hold it, that, you know, maybe a year would be okay, but six months didn't. And because we didn't explain why it would be any more worrisome to have something within seven months or three months than six months, so we didn't pinpoint where this would happen. But we don't have to pinpoint that because courts are not supposed to get into the fine-tuning aspect of this. And we had testimony to support six months as a reasonable basis. And on top of that, the six-month rule does not, which is an important element under Buckley v. Vallejo, the six-month rule does not impede the ability to have competitive races, to have serious campaigns conducted with a lot of participation and involvement of the populace and the candidates being able to communicate with them. We had ample evidence. There were 74 people running for ten city council seats in the 2014 election. That's a huge number of people to be running. And there was money in the system. People campaigned. There was over $2 million spent altogether in, I believe, the council member races. I don't know if I'm including the mayor's race in that or not. I just can't remember right now. But there was ample money, ample participation. Austin is a wide-open city politically, so to speak. It is a very lively political city. And so I don't think there's any testimony to suggest that the six-month limit impeded the ability of people to actually get the campaign voice out there through the contributions that come in through the last six months. There's nothing that I know of that calls that into question. Mr. Zimmerman didn't like it. But he actually won in the six-month limit. But he didn't like it because he thought that he had created some problems for himself that some of the community might not like and come down on him on. And so he wanted to raise money ahead of time. But he had no evidence that he had to have that to have a full-throated campaign. I want to turn briefly to the matter that the judicial notice issue of yesterday with respect to the records that were post-trial that have been added to the supplement, the records that have been supplemented with him. One thing that's missing from that and the reason there's still no standing for Mr. Zimmerman to challenge the 90-day disgorgement provision, which Judge Yackel invalidated, I think, as I recall, the affidavit, which I opposed being made part of the record, but the declaration at the end, Exhibit E in their motion, said, I have 500 and some odd dollars left in that campaign account, and I want to use it for campaign speech. Now, he's not in a campaign, so I don't know how he's going to use it for campaign speech, but there's nothing in any of that record that suggests that all the expenses from the prior campaign have been paid. And under that provision of the Charter, you aren't even subject to the rule, the 90-day disgorgement rule, until you've paid off all of your campaign expenses. So we don't know from what came in yesterday, that doesn't establish that he is subject to that rule for that 500 and some odd dollars that he still has. Besides that factual argument, do you have a case that stands for the proposition you're urging, that a disgorgement provision doesn't implicate speech? I've just not seen this come up. But there's no case either way, because it's the only claim they have is a First Amendment claim. Now, there may be other issues with respect to this, takings issues perhaps, something like that. I'm not agreeing at all, but there may be. But there's not a First Amendment issue because the campaign contribution was for this campaign. And while I'm thinking about it, in last Friday or Thursday, the D.C. Circuit en banc decided the Holmes case, and it has an issue in there with regard to election cycles. And in there it says — I can't remember the page number. I have it at my desk. But somewhere in there it says it may be appropriate, perfectly appropriate, for Congress to assume that there are different associational interests associated with, for instance, a primary campaign and, on the other hand, a general election campaign, so that's the reason it's appropriate to have separate elections instead of doing the whole election cycle. That's the same point being made here. When you make a contribution, you make it for that campaign for that time. And so Mr. Zimmerman was not given carte blanche. Here's I loved you forevermore. Here's money to go spend in campaigns. It was a one-time deal. And his campaign is over. There is nothing, no campaign expenditure to make with respect to that. So the First Amendment issue, there's no life left in the First Amendment contribution. Time has expired. Thank you. Sorry you saved time for rebuttal. Okay, thank you. I'll start with Mr. Hicks' comments on the aggregate limit challenge, the $36,000 out-of-Austin fundraising limit. First of all, every campaign finance case that's ever been litigated is about a plaintiff who says, I want to do X with my money, and the law says I can't do that, and that confers standing on that plaintiff. The fact that they can spend money when expenditures are banned and the fact that they can spend it on issue speech or something else, this is Mr. Hicks' argument that, well, if he would just have spent his money to retire his campaign debt or do something else, he wouldn't have had any leftover funds and he can't complain about this disgorgement provision. I mean, that goes to the disgorgement provision. But it's the same argument with respect to standing. He has the right to say, I have an interest that's arguably affected with a constitutional interest, I want to spend my money in a certain way, I want to take these contributions, send these solicitations, and the government says I can't. That is a constitutional injury. The fact that he changed his mind and forewent fundraising plans that he would have otherwise undertaken, and by the way, sending solicitations is protected speech. Sending a political solicitation, and this is in Zimmerman's uncontested affidavit submitted with the Rule 59E motion after trial, where he says, yes, I still want to do this, and what I would do is send out solicitations explaining my views on issues in Austin and why people should give me money to run against these establishment people here in the city. He did not send those solicitations because this $36,000 limit arbitrarily capped the potential return he would get. And there's cases I've cited in the briefs that go to this issue. What about getting to the blackout? Because you didn't have much time to talk about that. He says no problem with that, telling you you can't raise money early. Well, I mean, this is a remarkable claim. And first of all, it's on the narrow issue. This issue is controlled by Catholic leadership, this circuit's opinion in Catholic leadership, and especially page 432 and 433 of that opinion where this court rejects the government's anti-circumvention argument because what they say is that, first of all, they explain, as I have in the brief, why there's no anti-corruption interest here at all. But then they go on to say even if they're talking about the legislative session ban in Texas law and then the judicial, there's a judicial time period in Texas law, and they say, okay, even if you look at this blackout period as, I mean, this 60-day waiting period on GPACS, even if it had a nexus to either of those laws, in other words, even if it were tied to, you know, the legislative session ban, let's say, or the judicial ban on contributions with the same time period, and you can see how it tries to prevent circumvention of those, the Fifth Circuit said it's still unconstitutional because under the logic of McCutcheon. In light of the ability to pass base limits that are more targeted, if you have a time period that's more, you know... You need a separate justification for a time period? That's the takeaway from Catholic leadership? Right, well, the takeaway is that basically base limits are fundamentally different. That's how Buckley and McCutcheon said you address corruption. And McCutcheon did involve a temporal aspect because McCutcheon said the fundamental problem is that once the limit kicks in, you can't make a contribution of any amount, even though at other times you can make contributions up to the base limit. That's the same issue here. It's not a hard temporal period, but it's the same principle, and they can't distinguish that, and I think when you read page 432 of Catholic leadership, that part about the, you know, how even if it had that nexus to those bans, it controls this issue on the blackout period here. That isn't the reasoning Yackel gave, though. I understand that reasoning, right? But Yackel did find an anti-corruption interest shown. Well, and actually, no, I'm glad you brought that up because he did not say that. If you read the district court opinion, he did not agree with the city that this addressed the government interest. I think it's just a matter of reading that language, but I dispute that claim. As to the, let's see, on the base limit, first of all, this is not something that's made up out of whole cloth. All you have to do is read the, it's a plain text of the charter, where it uses campaign contributions in the base limit and uses political contributions and just the word contributions and other provisions in the same section of the city charter, you have to read that to give effect to those. And this, the court cannot rewrite the statute for the city to avoid this problem. And if, by the way, if somebody did take an unlimited officeholder contribution, they couldn't be prosecuted, no matter what the city says, because it would be a due process violation. So you have to read the plain text of the charter and rule based on that. And my time has expired. All right. Thank you, Mr. Navarro. And your case is under submission. Thank you. Next case, please.